Filed 8/6/13  P. v. Gutierrez CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JUAN CARLOS GUTIERREZ,<br><br>    Defendant and Appellant. | B237657<br><br>(Los Angeles County<br>Super. Ct. No. BA333493) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Lance E. Ito, Judge.  Affirmed as modified.

Victor J. Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr. and Nima Razfar, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant Juan Carlos Gutierrez of two counts of premeditated murder (Penal Code, § 187, subd. (a))[1] (counts 1, 4) and two counts of attempted premeditated murder (§§ 664, 187, subd. (a)) (counts 2 & 3). In counts 1, 2, and 4, the jury found that defendant personally and intentionally discharged a firearm causing great bodily injury or death (§§ 12022.53, subd. (d)), and in count 3 that he personally and intentionally discharged a firearm (§ 12022.53, subd. (c)). The jury found that the crimes in counts 1 through 4 were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)). In counts 1 and 4, the jury found the following special circumstances true: (1) that the crimes were committed while defendant was an active participant in a criminal street gang within the meaning of section 190.2, subdivision (a)(22); and (2) that the murders were intentional and perpetrated by means of discharging a firearm from a motor vehicle at persons outside the vehicle with intent to inflict death within the meaning of section 190.2, subdivision (a)(21). In count 4, the jury found true the special circumstance allegation that defendant committed multiple murders within the meaning of section 190.2, subdivision (a)(3).[2]

The trial court sentenced defendant to two consecutive terms of life without the possibility of parole in counts 1 and 4, two consecutive terms of 15 years to life in counts 2 and 3, and four consecutive terms of 25 years to life on the firearm enhancements.

Defendant appeals on the grounds that: (1) the trial court committed reversible error when it accepted the prosecutor's stated reasons for excusing an African-American prospective alternate juror, because the reasons were unsupported by the juror's statements on voir dire; (2) the trial court committed reversible error when it failed to conduct a sufficient inquiry into a juror's complaint that another juror's abusive behavior was derailing deliberations; and (3) the trial court erred when it imposed a sentence

---

[1]   All further references to statutes are to the Penal Code unless stated otherwise.

[2]   Defendant was tried along with codefendant Amilcar Romero. The jury deadlocked on the charges against Romero, and the trial court declared a mistrial.

enhancement of 25 years to life on defendant's conviction of attempted premeditated murder in count 3.

## FACTS

### Prosecution Evidence

#### A. The October 7, 2007 Murder in Count 4

At approximately noon on October 7, 2007, Freddy Contreras encountered his friend Stanley Garcia near the intersection of Sunset Boulevard and Grand Avenue. They bought beers at a liquor store and went to a park. Afterwards, Contreras and Garcia parted ways near the corner of Alpine Street and Grand Avenue. As Contreras walked away, he turned around and saw a black SUV with a chrome grill pull up next to Garcia on the passenger side. Contreras saw only one person, the driver, inside the vehicle, and he later identified him as defendant. As Contreras stood watching, he heard defendant ask Garcia, "Where are you from?" Garcia responded, "Alpine Street," a reference to the Alpine gang to which he belonged. Defendant's hand came up and he shot Garcia with an automatic weapon three or four times. Garcia fell to the ground. Defendant "took off." Defendant was wearing a black baseball cap with "Sox" written on it.

Stuart Wilson was in a nearby residence when he heard three gunshots. He ran toward the scene and saw Garcia on the ground with two bullet wounds. Wilson made a tourniquet with his belt around Garcia's arm. Garcia told Wilson that the shooter wore a black White Sox baseball hat. He said the shooter asked him where he was from. A 911 call was made and paramedics arrived and took Garcia to the hospital. Police officers found an expended round at the shooting scene.

On the day of the shooting, Brenda Paredes was living in an apartment on Alpine Street. She lived with her children and Paul Cortez, her boyfriend. Cortez was called "Little Man" and was a member of the Mara Salvatrucha (MS) gang. Defendant was a friend of Cortez and was called "Commando." Defendant drove a black Expedition. About five days after the shooting, defendant visited the residence of Paredes and Cortez. Paredes overheard defendant apologize to Cortez for committing a shooting so close to Cortez's residence because authorities might believe Cortez was involved. Defendant

3

told Cortez he asked Garcia which gang he belonged to. They argued, and defendant shot him.

Garcia suffered a hip fracture and multiple hand fractures from gunshot wounds. During hip surgery, a projectile was removed from his body and booked into evidence. Garcia died 11 days after the shooting as a result of multiple gunshot wounds. Copper fragments were obtained by the coroner from Garcia's body during the postmortem.

### B. The December 10, 2007 Murder and Attempted Murders (Counts 1, 2, and 3)

On the late morning of December 10, 2007, Edwin Santos and his girlfriend, Nelly Vergara, were waiting for a bus near the corner of Venice Boulevard and Wilton Place. A friend, Lazaro Arana, waited with them. Santos and Arana were members of the Playboy gang, and Lazaro had a Playboy bunny tattoo on his cheek. The Playboy gang was a rival to the MS gang. As the three waited, a black SUV occupied by five or six men pulled up in front of them. The front passenger, later identified as defendant, said, "Where are you fools from?" Defendant pulled a gun from the area of his waist and pointed it at them. The group immediately began running away as defendant began firing. The SUV then drove away. Santos was shot twice in the arm and once in the back. Nelly was killed by a gunshot wound to the chest. Arana was not hit.

Jaime Galeano witnessed the shooting as he sat in his parked vehicle nearby. He had noticed the black SUV as it drove by, and he saw it immediately return, having apparently made a U-turn. The vehicle pulled over next to the victims. After the passenger spoke to the three victims, shots rang out from the passenger of the car. Galeano identified defendant as the shooter.

After the shooting, police analyzed GPS tracking devices on any parolee who might have been in the vicinity of the shooting around the time it occurred. Using a database, an officer identified a tracking device worn by parolee John Garcia on his ankle. Garcia had been placed on GPS because of his gang affiliation with MS. Data for his tracking device showed the date, time, and latitude of where the device was located at the time of the shooting. It showed the device was on the corner of Venice Boulevard and Van Ness Boulevard.

4

On the afternoon of the shooting, after tracking Garcia's whereabouts to Compton, police found a black SUV parked in front of a house at 1518 Tamarind Avenue and set up surveillance. At approximately 3:00 p.m., two young Hispanic males got into the SUV. They drove to a liquor store where they were detained. The driver was codefendant Romero, who had burn scars on his arms. The passenger was identified as Edwin Guzman. An officer drove the SUV back to 1518 Tamarind Avenue, and the police continued to monitor the location.

Police saw four individuals come out of the residence and ordered them to lie down on the ground. The individuals were defendant, John Garcia, Jesse Castro, and Israel Flores. Garcia was wearing a GPS ankle bracelet. Inside the residence police found a .38-caliber gun hidden in the attic and a .38-caliber bullet hidden in between a mattress and box spring. Ballistics tests later confirmed that the .38-caliber gun fired bullet fragments recovered from Vergara, Santos, and Garcia.

In a police interview, Flores acknowledged he was a member of the MS gang. Flores admitted he was sitting in the backseat of the SUV during the shooting. He said he and a friend got a ride from some people he did not know. He then confirmed that Romero was the driver, identifying him as the one with the burned arms. He confirmed that defendant sat in the front passenger seat. Flores denied seeing who fired the shots from the car.

### C. Gang Evidence

Detective Frank Flores testified as a gang expert. The detective explained the history of the MS gang, which began in the 1980's at the time of a large influx of persons fleeing Central America. The gang has a presence in approximately 40 states and has 500 to 1,000 members in Los Angeles. In 2007, MS and the Playboy gang were enemies. The area of the December 10 shooting was just outside MS gang territory and known to be frequented by Playboy gang members. The MS gang's primary activities included murder, assaults, robberies, extortions, vandalism, and narcotics sales. Flores identified two MS gang members who had been convicted of murder in 2008 and 2009.

Flores testified that when defendant's jail cell was searched, officers found several items attesting to his affiliation with the MS gang. A lid on a box of playing cards bore the words "El Commando," "Parkview," and "Mara Salvatrucha." Parkview Locos is a clique in the MS gang. A soapbox bore the initials "PVLS." Other papers and writings were discovered that bore MS writings and symbols. Defendant had several tattoos with the letters "MS" on his body, face, and head. He had an "M" on one cheek and an "S" on the other. Detective Flores testified that defendant's tattoos were indicative of being an MS member. Codefendant Romero acquired an "MS" tattoo on his chest while in jail on the current charges.

Detective Flores was of the opinion that the charged crimes were committed for the benefit of the MS gang. The detective explained that respect in the gang culture is extremely important, and an MS member would take it as disrespect for someone to shout out the name of his gang. Respect is gained by committing acts of violence. An encounter with gang members from a rival gang in a rival territory would provide an immediate opportunity to commit an act of violence. It is an opportunity for the perpetrators to prove themselves to other gang members. Acts of violence promote a gang member's status within a gang and help instill fear not only in the gang's rivals but also in the community at large.

**Defense Evidence**

Codefendant Romero called Dr. Mitchell Eisen, an expert on eyewitness memory identification. He described findings that have gained general acceptance in his field. He explained that humans have limits on how much information they can take in and retain. All memory is considered to be reconstructive, or revised each time we remember something. Stress and trauma affect memory in that we focus only on what is essential for survival. Memory is more accurate closer to the event and is not affected by postevent information. People feel more confident later on because they have decided on the memory. Dr. Eisen explained that minor additions and omissions in a person's memory after repeated interviews regarding an event were natural and expected but contradictions are not, and they indicate problems with the memory.

6

## DISCUSSION

### I. Denial of *Batson/Wheeler* Motion

#### A. *Defendant's Argument*

According to defendant, the record establishes that the prosecutor's proffered reasons for excusing a prospective alternate juror were pretexts for racial discrimination, and the trial court erred in accepting the reasons.

#### B. *Proceedings Below*

Toward the end of voir dire, during the selection of four alternates, Andrew Stein, defendant's attorney, made a *Batson/Wheeler* motion after the prosecutor sought to exercise a peremptory challenge to Juror No. 1308. Stein argued that this juror was the third African-American juror who had been seated in the total venire. The prosecutor had exercised challenges to the other two: a traveling chef and a musician. "And this young lady was just excused, African-American woman, South Central L.A., single, academic advisor for USC. No prior jury experience. I have not seen anything challenge for cause. She's intellectual. She's the average juror." Codefendant's attorney, Jaclin Awad, joined in the motion.

The prosecutor argued that there had been one African-American, the chef, and that juror had stated he would be uncomfortable rendering a guilty verdict even if it were proved to him beyond a reasonable doubt. The prosecutor did not believe the musician, or singer, was African American. He agreed that Juror No. 1308 was African-American and stated, "but one thing that counsel failed to see is, she's like one of the only jurors who say, 'I live in a neighborhood where there is Neighborhood Crips.' And she did not have a strong opinion about gangs after that. She knew specifically the gang of the neighborhood. She's lived in South L.A. her whole life and not been affected by gangs, even though she had a strong opinion about gangs. The Neighborhood Crips gang, that's a violent gang. And even after living in a neighborhood like that, she did not have a strong opinion against that. Given that, and her background, which is in higher education—I think the issues in this case are, 'How do you feel about gangs and your views on gangs?' And I think she may have—at least, my opinion is that she may have a

sympathetic view or view not necessarily—that does not necessarily disfavors gangs. In other words, she's okay with it, okay if the Neighborhood Crips don't cause any problems." The prosecutor stated that his reason for excusing this juror was her type of knowledge about gangs and not her race. He would have done the same if she were Hispanic or White because he did not feel comfortable with her.

The prosecutor reiterated that the singer, Juror No. 6198, was not African-American, although she may have been of mixed race. For the sake of a complete record, he stated that Juror No. 6198 said she would be "very open-minded" and had no impression of gangs. The prosecutor did not feel she would be the type of juror he desired because of her liberal background.

The trial court observed that Juror No. 6198 was clearly of mixed race but believed she had an African-American "background." The court agreed that the other two jurors at issue were African-American. The court believed that the circumstances met the standard for a *Batson/Wheeler* challenge and asked the prosecutor if he had anything to add to his explanation for his exercise of peremptory challenges.

The prosecutor noted that he had selected several juries before the trial court and had shown he did not use race to select jurors. He had always selected jurors from all races, regardless of the defendant's background. He believed he had indicated sufficient race-neutral reasons for excusing the jurors at issue and that no one could state a ground for finding those reasons untrue. The prosecutor added that the singer was from a type of liberal background that many prosecutors avoid. In addition, the singer said she had "no impression" about gangs and was "very, very neutral" about them. The prosecutor reiterated that Juror No. 1308 had lived in South Los Angeles all of her life and had a neighbor who is a Neighborhood Crip, but she had said she was not affected or did not have a negative impression about this gang. The prosecutor did not believe that Juror No. 1308 was forthright in the information she divulged. The prosecutor stated that Juror No. 1308 was distinguishable because most of the jurors did not know someone from an actual violent gang, and "this whole case is about your views on gangs."

8

Stein argued that there were "lots of people" sitting in the box who had neutral feelings on gangs. Stein then reviewed the jurors the prosecutor had accepted and who had no exposure to gangs. The prosecutor countered that many of those jurors had also indicated they thought the LAPD was fine or did a good job, unlike Juror No. 1308, who just had a neutral view of the police. Stein also reviewed the jurors the prosecutor had excused, pointing out that most of them were neutral about gangs. Awad argued that Juror No. 1308 was no different than other jurors on the panel who had been exposed to gangs but who said they had not had problems with gangs. Stein and Awad's preferred remedy was to have Juror No. 1308 reinstated as an alternate. The prosecutor repeated his arguments that Juror No. 1308 was the juror with the greatest connection to a gang but was nevertheless neutral about gangs. The prosecutor was not saying she was the worst juror, but he preferred to use his peremptory challenges rather than risk a hung jury by accepting a juror who would ultimately be sympathetic to a gang member.

The trial court observed that it had extensive experience with the prosecutor. The court had not found him to exercise peremptory challenges in a racially biased manner. The court accepted his justifications in particular with regard to Juror No. 1308, stating, "For a person to . . . grow up in South Central L.A., to be acquainted with the Neighborhood Crips, and they have no—to have a very neutral opinion about them, the destructive force that they are in society, that is a reasonable basis for the prosecution to exercise a peremptory challenge."

### C. Relevant Authority

*People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) held that a prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group membership violates a criminal defendant's right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution. (*Wheeler,* at pp. 276-277.) *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) held, inter alia, that such a practice violates a defendant's right to equal protection of the laws under the United States Constitution's Fourteenth Amendment. (*Batson,* at pp. 84, 86, 96-98.)

9

In *Batson*, the United States Supreme Court set out a three-step inquiry for resolving a *Batson/Wheeler* motion. "First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge based on race. Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason. Third, the court determines whether the defendant has proven purposeful discrimination. The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. [Citation.] The three-step procedure also applies to state constitutional claims. [Citations.]" (*People v. Lenix* (2008) 44 Cal.4th 602, 612-613 (*Lenix*); see also *Johnson v. California* (2005) 545 U.S. 162, 168.)

"At the third stage of the *Wheeler/Batson* inquiry, 'the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' [Citation.] In assessing credibility, the court draws upon its contemporaneous observations of the voir dire. It may also rely on the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office that employs him or her. [Citation.]" (*Lenix*, *supra*, 44 Cal.4th at p. 613, fn. omitted.)

"Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions. [Citation.] 'We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges "'with great restraint.'" [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]' [Citation.]" (*Lenix*, *supra*, 44 Cal.4th at pp. 613-614, fn. omitted.)

### D. Sufficient Evidence Supports Trial Court's Ruling

When ruling on a defendant's *Batson/Wheeler* motion, the trial court must decide not only whether the prosecutor's stated reasons are race neutral, but whether those stated reasons actually prompted the peremptory challenge, or whether they are sham excuses. (*Batson*, *supra*, 476 U.S. at p. 98; *Wheeler*, *supra*, 22 Cal.3d at pp. 281-282.) In deciding if the defendant has carried his burden of persuasion, a court must undertake a sensitive inquiry into the available circumstantial and direct evidence of intent. (*Wheeler*, at p. 282; *Batson*, at p. 93.) That evidence includes a comparative analysis of the jurors struck by the prosecutor with the characteristics of other prospective jurors whom the prosecutor did not strike. (*Miller-El v. Dretke* (2005) 545 U.S. 231, 239-240; *Lenix*, *supra*, 44 Cal.4th at p. 622.)

Comparative juror analysis on a cold record has inherent limitations, since tone and expression cannot be conveyed. Also, two potential jurors may give similar answers to a given question, yet another question may make one of those jurors appear to be more of a risk for a party. (*People v. Riccardi* (2012) 54 Cal.4th 758, 788.) Thus, "[a] party concerned about one factor need not challenge every prospective juror to whom that concern applies in order to legitimately challenge any of them." (*People v. Jones* (2011) 51 Cal.4th 346, 365.) Comparative analysis may provide circumstantial evidence of discriminatory exercise of peremptory challenges, but it is not dispositive. It is but one form of relevant circumstantial evidence. (*Lenix*, *supra*, 44 Cal.4th at p. 622.) A court must consider the "totality of the record" in assessing whether a party's peremptory challenge rested upon an unlawful group bias. (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1322.) As *Lenix* stated, "On appellate review, a voir dire answer sits on a page of transcript. In the trial court, however, advocates and trial judges watch and listen as the answer is delivered. Myriad subtle nuances may shape it, including attitude, attention, interest, body language, facial expression and eye contact." (*Lenix*, *supra*, 44 Cal.4th at p. 622.) "A transcript will show that the panelists gave similar answers; it cannot convey the different ways in which those answers were given. Yet those differences may

11

legitimately impact the prosecutor's decision to strike or retain the prospective juror." (*Id*. at p. 623.)

Keeping these principles in mind, we believe the trial court here demonstrated "a sincere and reasoned effort" to evaluate the prosecutor's explanation in light of the circumstances of the case before it, and that its decision is therefore entitled to deference. (*Lenix*, *supra*, 44 Cal.4th at p. 614; *People v. Arias* (1996) 13 Cal.4th 92, 136.)  The prosecutor's explanations were """"clear and reasonably specific."""" (*Lenix*, at p. 613.) As stated in *Lenix,* "'The justification need not support a challenge for *cause*, and even a "trivial" reason, if genuine and neutral, will suffice.' [Citation.]" (*Ibid*.)  In this case, the prosecutor's reasons were not trivial in light of the circumstances of the case, and the totality of the record supports the trial court's ruling.

The record shows that Juror No. 1308 went to high school in Southern California, lived in a gang area in South Central Los Angeles claimed by the Neighborhood Crips, and had neighbors who were gang members.  Although this juror stated that the word "gangs" brought to mind that "they're typically violent, drugs, things like that," she nevertheless professed a degree of uncertainty and ignorance about who among her neighbors was a gang member and which gang was on the block.  She also professed having no problems with gang members because she did not engage with them.  She stated that no one close to her had had a negative experience with gangs.  She appeared to be evasive in her answer to a question about gang clothing and characterized gang-banger dress as a "fashion choice[]" that did not capture her attention.  These characteristics were unique to this juror.

The majority of the jurors whom the prosecutor did not seek to excuse  (Juror Nos. 1032, 2249, 5655, 3656, 2581, 0677, 1225, and 5356) had no experience with gangs, or minimal experience.  Juror No. 2487 had little exposure to gangs outside of seeing graffiti and having concerns for her children in high school.  Another juror (Juror No. 7662) said that the "gangs" in her area consisted of skateboarders.  The jurors who did have exposure to gangs had negative opinions of gangs and very positive opinions of the police, unlike Juror No. 1308.  Juror No. 4695 said he had lived in Los Angeles all his

12

life and had "see[n] a lot of gangs," but lived in a city where there was not "that kind of problems," and the police do a "great job." Juror No. 8533 had gangs and drug dealers in her city. Unlike Juror No. 1308, she saw most gangs as problematic and believed that when one is in a gang, one was going to do something that is not good. Although she was neutral in her attitude toward the police, she credited their constant visits to her drug-dealing neighbors as the reasons the neighbors were "booted out." Juror No. 1009, the postal worker who saw gang members every day on his route did not live in an area where there were gangs, and, in his experience, the police did a "very good job." Juror No. 6534 said he had always been in areas with gangs, but he did not know any gang members, and he thought the police did a good job. Finally, Juror No. 9111 only knew gangs from the graffiti at his university and from his university's outreach to gangs. He had frequent contact with the police and had no issues with them. Another factor cited by the prosecutor as a reason for retaining certain jurors was the juror's belief that the LAPD was doing a fine job, unlike Juror No. 1308, who was "neutral" about both gangs and the LAPD, despite living in a Neighborhood Crips neighborhood. The majority of the jurors retained by the prosecutor expressed high approval of the LAPD, as we have noted in a few instances *ante*. Eight of the 15 prospective jurors selected to be jurors and alternates made laudatory comments about the police (Juror Nos. 6534, 3656, 2487, 2581, 7662, 1009, 5356, 4695). Another juror (Juror No. 1032) stated that he believed the LAPD had "improved a lot." Juror No. 5655, who stated he was "ambivalent" and had no personal negative feelings about the LAPD, did not go to high school in Los Angeles, and his father had been a police officer in another state. Another who said the LAPD was "okay" later explained that he said that because he had no experience with them. He later added that he had gone to high school in New Jersey (Juror No. 1225). Another who had "no impression" about the LAPD had moved here from New York only two years before (Juror No. 0677).[3] Juror No. 9111, who had "no issues" with the LAPD and was aware

---

[3] This juror, after being sworn in, wrote a note to the court and was excused, leading to the selection of an alternate.

of gangs from his university's outreach, had "quite a few" friends or acquaintances in law enforcement and had frequent contacts with the LAPD. He asserted he would not judge the LAPD witnesses based on one incident of domestic violence he knew of in which he believed the police had not acted appropriately. Another juror who was "pretty neutral" about the LAPD and had "[no] strong opinion one way or the other" (Juror No. 2249) did not live in an area with strong gang presences and had no experience "whatsoever" with gangs. He worked closely with the police at his university. Thus, even the jurors who did not outright praise the LAPD had different backgrounds and lived in different circumstances compared to Juror No. 1308, who stated she was "neutral" in her feelings about the LAPD. Although defendant argues that the trial court did not rely on this factor in its ruling, "the trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine." (*People v. Reynoso* (2003) 31 Cal.4th 903, 919.)

Furthermore, the record affirms the prosecutor's belief that Juror No. 6198, who was of mixed race, had a liberal background that might disfavor the prosecution.[4] When asked about her knowledge of gangs, she stated she was acquainted with gangs from living in Philadelphia and Washington, D.C., but, much like Juror No. 1308, gangs were never a problem for her. When asked how she felt about gangs, she commented only that, in her world travels, she had encountered many "gang tribes." When asked what came to mind for her when the word "gang" or "gang member" was mentioned in relation to Southern California, this juror said, "nothing comes to my mind."

With respect to any similarities that might exist between Juror No. 1308 and certain nonchallenged jurors, we bear in mind the *Lenix* court's observation that "the selection of a jury is a fluid process, with challenges for cause and peremptory strikes continually changing the composition of the jury before it is finally empanelled. As we

---

[4]    Stein conceded that the record justified the prosecutor's excusal of Juror No. 0277, the chef.

14

noted in *People v. Johnson* (1989) 47 Cal.3d 1194: '[T]he particular combination or mix of jurors which a lawyer seeks may, and often does, change as certain jurors are removed or seated in the jury box. It may be acceptable, for example, to have one juror with a particular point of view but unacceptable to have more than one with that view. If the panel as seated appears to contain a sufficient number of jurors who appear strong-willed and favorable to a lawyer's position, the lawyer might be satisfied with a jury that includes one or more passive or timid appearing jurors. However, if one or more of the supposed favorable or strong jurors is excused either for cause or [by] peremptory challenge and the replacement jurors appear to be passive or timid types, it would not be unusual or unreasonable for the lawyer to peremptorily challenge one of these apparently less favorable jurors even though other similar types remain. These same considerations apply when considering the age, education, training, employment, prior jury service, and experience of the prospective jurors.' [Citation.]" (*Lenix*, *supra*, 44 Cal.4th at p. 623.)

We conclude that substantial evidence supports the trial court's ruling regarding the excusal of prospective alternate Juror No. 1308. It is "discernable from the record that (1) the trial court considered the prosecutor's reasons for the peremptory challenges at issue and found them to be race neutral; (2) those reasons were consistent with the court's observations of what occurred, in terms of the panelist's statements as well as any pertinent nonverbal behavior; and (3) the court made a credibility finding that the prosecutor was truthful in giving race-neutral reasons for the peremptory challenges." (*Lenix*, *supra*, 44 Cal.4th at p. 625.) We therefore conclude the trial court did not err by denying defendant's *Batson*/*Wheeler* motions.

## II. Juror's Complaint About Fellow Juror

### A. Defendant's Argument

Defendant contends the trial court erred by failing to question a complaining juror who wrote a note to the trial court about his discomfort with another juror's abusive behavior. The court questioned only the foreman. As a result, defendant argues, prejudicial misconduct very likely went undiscovered and unremedied. Defendant asserts that this Court must reverse the judgment because the error undermined defendant's Sixth

15

Amendment right to a fair and impartial jury, and it cannot be said that the error was harmless beyond a reasonable doubt.

### B. Proceedings Below

The jury retired to commence deliberations on the afternoon of Friday, October 7, 2011. At the beginning of the third day of deliberations, the trial court read a letter it had received that morning. Juror No. 6 (Juror No. 5655) wrote: "Your Honor, I am writing this note to bring your attention to some inappropriate behavior in this jury room that made me feel threatened and not comfortable being in a room with a certain individual. Juror No. 2 [Juror 1225] has twice now attacked me, personally shouting obscenities with vitreal [*sic*] regarding something he accuses me of that I neither said nor did, and also something completely unrelated to this trial. This is derailing our deliberation and making me feel threatened to be in a room with him. It is because of this erratic, delusional, abusive behavior that I respectfully request this juror be replaced with one of our level-headed alternates. Thank you for your consideration. Respectfully, Juror No. 6."

The court clerk told the trial judge that the foreperson had mentioned that two of the jurors were not getting along and that it was causing discord in the jury room. The behavior had begun the previous Friday (the first day of deliberations). The trial court observed that the foreperson was a dean of students at a major educational institution, and one of his responsibilities is to make sure students "play nice with each other." After determining with counsel the appropriate answer to two jury queries, the trial court summoned the foreperson (Juror No. 9/ 9111) to learn about the behavior issue. When asked if there was a "personality issue" that was disrupting deliberations, the foreperson replied, "There has been. Today has been okay." The following dialogue ensued:

> "COURT: So we're okay? Okay. Then please don't discuss what we've just discussed with anybody else, and we'll—in a matter of moments, I am going to send you a response to the two other questions.
>
> [JUROR NO. 9]: Great.

16

COURT:  So you don't think we need to inquire into this at all?

[JUROR NO. 9]:  Again, I think today has been fine.  We did have some issues on Friday afternoon and yesterday morning.

COURT:  All right.  Given your professional position, since part of your responsibility, my guess is that make sure people play nice with each other—

[JUROR NO. 9]:  Uh-huh.

COURT: So we're okay?

[JUROR NO. 9]:  Uh-huh. Yes.  And I just think there were some personality differences that we've had to multiple times say that's not part of what we're talking about, leave that alone.  So I think we're okay.

COURT:  I'm glad you're our foreman.

[JUROR NO. 9]:  Thanks.

After the foreperson left the courtroom, the court stated, "There's the old adage, let sleeping dogs lie.  So I don't think I am going to inquire on this any further, unless something else happens . . . ."

### C.  Relevant Authority

"[T]he court does have a duty to conduct reasonable inquiry into allegations of juror misconduct or incapacity—always keeping in mind that the decision whether (and how) to investigate rests within the sound discretion of the court."  (*People v. Engelman* (2002) 28 Cal.4th 436, 442.)  "Since the court has power to investigate and discharge jurors who refuse to adhere to their oaths, it may also take less drastic steps where appropriate to deter any misconduct or misunderstanding it has reason to suspect." (*People v. Keenan* (1988) 46 Cal.3d 478, 533.)

A trial court does not have a duty to investigate every possible instance of juror misconduct.  (*People v. Hedgecock* (1990) 51 Cal.3d 395, 419.)  "'[N]ot every incident involving a juror's conduct requires or warrants further investigation.  "The decision whether to investigate the possibility of juror bias, incompetence, or misconduct—like

17

the ultimate decision to retain or discharge a juror—rests within the sound discretion of the trial court.'" [Citations.] "'[A] hearing is required only where the court possesses information which, if proven to be true, would constitute 'good cause' to doubt a juror's ability to perform his duties and would justify his removal from the case.'" [Citation.]" (*People v. Martinez* (2010) 47 Cal.4th 911, 942.) A defendant is not entitled to such a hearing as a matter of right. (*People v. Dykes* (2009) 46 Cal.4th 731, 809.)

### D. *No Error or Abuse of Discretion*

At the outset, we do not agree with respondent that defendant has forfeited this issue on appeal. The trial court had the duty to conduct a reasonable inquiry into juror misconduct consistent with defendant's right to a fair trial. (*People v. Engelman*, *supra*, 28 Cal.4th at p. 442].) "Accordingly, because defendant's claim is that the trial court erred by failing, sua sponte, to conduct an adequate inquiry, no trial court action by the defense was required to preserve the claim." (*People v. Cowan* (2010) 50 Cal.4th 401, 506-507.)

"[A] trial court's inquiry into possible grounds for discharge of a deliberating juror should be as limited in scope as possible . . . ." (*People v. Cleveland* (2001) 25 Cal.4th 466, 485.) The purpose of this rule is to protect "the sanctity of the jury's deliberations." (*Ibid.*) We conclude the trial court acted well within its discretion in deciding that no further inquiry was necessary in this case. In order to justify investigation, there must be more than mere speculation of juror misconduct. The juror's inability to perform must appear as a ""'demonstrable reality."'" (*People v. Williams* (1997) 16 Cal.4th 153, 231.) Here, defendant failed to show "'a strong possibility that prejudicial misconduct ha[d] occurred.'" (*People v. Brown* (2003) 31 Cal.4th 518, 582.) Juror No. 6's letter conveying his personal conflict with another juror over an issue that was "completely unrelated to this trial" reflected just that—a personal discomfort with another juror rather than any bias against defendant or an inability to fulfill his duties as a juror. The trial court appropriately questioned the foreperson and satisfied itself that the conflict had abated and would not affect the deliberations. Asking the two jurors about the issue could have only called attention to these concerns and risked an exaggeration of the

situation as well as a distraction for the entire jury. The trial court was in the best position to evaluate the credibility of the foreperson, and we defer to its determination. (See *People v. Harris* (2008) 43 Cal.4th 1269, 1305.)

We observe that the court's question to the foreperson as to whether any further inquiry was necessary was nothing more than a request for the foreperson's opinion. The trial court clearly respected this juror's opinion based on his profession and the skills it required, as well as presumably this juror's demeanor during voir dire. His solicitation of the foreperson's opinion was not, as defendant asserts, an abdication of the trial court's duty. The trial court was well aware that the sanctity of deliberations must be protected, and courts must act reasonably when inquiring about potential misconduct. (*People v. Cleveland*, *supra*, 25 Cal.4th at p. 476.) Further inquiry may have prolonged the incident, or perhaps revived it. Juror No. 6 wrote no further notes of complaint to the trial court, and after the verdicts were rendered, he answered in the affirmative when asked to confirm the verdicts and findings on the allegations.

*People v. McNeal* (1979) 90 Cal.App.3d 830, on which defendant relies, is inapposite. In that case, the foreman wrote the trial court a note indicating that one of the jurors had personal knowledge regarding the case and had stated it would have a bearing on her vote. (*Id*. at p. 835.) Both the defense and the district attorney requested interrogation of the juror. (*Ibid*.) The trial court insisted it would make no inquiry on the factual basis of her knowledge, and it questioned the juror only on the issue of whether or not she could freely and impartially deliberate. (*Id*. at p. 836.) She eventually said she would. (*Ibid*.) The reviewing court determined that many of the juror's comments to the trial court and the foreperson created "something of a mystery." (*Id*. at p. 838.) The statements revealed a situation that was complicated, provocative, and "mystifying," and the trial court should have ascertained the factual explanation for the juror's remarks. (*Ibid*.) In the instant case, there is no indication that improper or external influences were brought to bear on Juror No. 6, or even on Juror No. 2. Juror No. 6 explained what Juror No. 2 was doing, even if he did not quote the actual words used. He said the matter had

nothing to do with the case, a situation that the foreperson confirmed. *People v. McNeal* does not aid defendant's cause.

Outbursts and displays of temper in the jury room are merely signs of heated debate, and they do not amount to prejudicial misconduct that impeaches a verdict. (*People v. Keenan*, *supra*, 46 Cal.3d at p. 541.) Defendant's assertions are no more than speculation, i.e., that an inquiry "*likely*" would have disclosed that the other juror had terrified the complaining juror to the degree that his participation was stifled, and that the trial court *may have* discovered that the other juror's conduct prevented Juror No. 6 from being impartial. We disagree with defendant's assertion that "*the only reasonable inference*" to be derived from the note was that Juror No. 6 was intimidated to the degree that his deliberations were improperly stifled. We conclude that the trial court did not abuse its discretion, and its questioning of the foreperson satisfied its obligation to investigate the possibility of juror misconduct while acting within the limits to which such an inquiry must be confined. There was no substantial likelihood that defendant's Sixth Amendment rights were violated, and reversal is not warranted under either the harmless error or the reasonable probability standards. (*Chapman v. California* (1967) 386 U.S. 18; *People v. Watson* (1956) 46 Cal.2d 818.)

## III. Enhancement Term in Count 3

### A. Defendant's Argument

Defendant contends that, since the jury did not find that he caused great bodily injury or death to Arana in the commission of the crime charged in count 3, the court was authorized only to impose an enhancement of 20 years for defendant's personal use and discharge of a firearm under section 12022.53, subdivision (c) in that count. It was not authorized to impose 25 years under section 12022.53, subdivision (d).

### B. Relevant Authority

In 2007, section 12022.53, subdivision (c) provided: "Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a), personally and intentionally discharges a firearm, shall be punished by an additional

20

and consecutive term of imprisonment in the state prison for 20 years."  The felony of murder (§ 187) was listed in section 12022.53, subdivision (a)(1).

Section 12022.53, subdivision (d) provided:  "Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a), . . . personally and intentionally discharges a firearm and proximately causes great bodily injury, . . . or death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life.

Section 12022.53, subdivision (f) provides, in relevant part:  "Only one additional term of imprisonment under this section shall be imposed per person for each crime.  If more than one enhancement per person is found true under this section, the court shall impose upon that person the enhancement that provides the longest term of imprisonment. . . ."

### C.  Proceedings Below

In count 3, defendant was charged with the attempted murder of Arana.  The second amended information shows that counts 1, 2 and 3 carried allegations under section 12022.53, subdivisions (c), (d), and (e)(1).[5]

During deliberations, the jury queried why the jury instruction for intentional and personal discharge of a firearm with proximate causation of great bodily injury or death (§ 12022.53, subd. (d)) applied only to counts 1, 2, and 4, while at the same time the verdict form for count 3 contained this allegation.  (CALCRIM No. 17.19.5.)  The trial court and the parties agreed that the section 12022.53, subdivision (d) allegation should be stricken from the verdict form for count 3.  The only remaining firearm allegations on

---

[5]    The information summary at the beginning of the information shows two allegations against defendant under section 12022.53, subdivision (d) associated with count 3, which would appear to be a clerical error.

21

the verdict form were pursuant to section 12022.53, subdivision (c)[6] and 12022.53, subdivision (b). Nevertheless, at sentencing, the trial court imposed an enhancement of 25 years to life for defendant's personal use and discharge of a firearm causing great bodily injury or death to Arana under section 12022.53, subdivision (d).

### D. Sentence Must be Modified

It appears that the trial court did not intend to impose the enhancement pursuant to section 12022.53, subdivision (d), but did so inadvertently. The trial court should have imposed the enhancement pursuant to section 12022.53, subdivision (c), the subsection on the verdict form that provided for the longest term of imprisonment and whose validity was shown by the evidence. This enhancement consists of a 20-year term rather than a 25-year term.

The record shows that the trial court intended to impose the maximum possible sentence. Moreover, the court had no discretion to do otherwise, since the statute required the trial court to impose the enhancement carrying the greatest punishment. Therefore remand for resentencing is not necessary, and we will modify the judgment. There is no reasonable probability the trial court on remand would exercise any sentencing discretion in appellant's favor. (See *People v. Murray* (1994) 23 Cal.App.4th 1783, 1792-1793 [where trial court clearly desired to impose maximum sentence, remand is unnecessary]; *People v. Burnes* (1990) 224 Cal.App.3d 1222, 1233-1234, disapproved on another point in *People v. McClanahan* (1992) 3 Cal.4th 860, 872 [where trial court exercised its discretion and articulated its view of the appropriate overall sentence, remand is unnecessary].)

### DISPOSITION

The judgment is modified to strike the firearm enhancement of 25 years to life under section 12022.53, subdivision (d), on count 3 and to impose the firearm enhancement of 20 years under section 12022.53, subdivision (c), on that count. As

---

[6] The verdict form contains an apparent typographical error in that it reads "12022.5(c)."

modified, the judgment is affirmed.  The superior court is directed to modify the abstract of judgment to reflect a term of 20 years pursuant to section 12022.53, subdivision (c) in count 3 and to forward a copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


CHAVEZ, J.


FERNS, J*

_____

*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice
pursuant to article VI, section 6 of the California Constitution.